Filed 11/28/22  County of San Diego v. P.W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>P.W.,<br><br>    Defendant and Respondent,<br><br>C.H.,<br><br>    Appellant. | D079477<br><br><br><br>(Super. Ct. No. 20DF003296C) |

APPEAL from an order of the Superior Court of San Diego County, Lizbet Muñoz, Commissioner.  Reversed and remanded.

Bickford Blado & Botros and Andrew J. Botros for Appellant C.H.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Darin L. Wessel, Deputy Attorneys General, for Plaintiff and Respondent County of San Diego.

Victor Mordey for Defendant and Respondent P.W.

# I

# INTRODUCTION

The San Diego County Department of Child Support Services (hereafter, the Department) filed an action against P.W. (Father) to compel him to pay child support to his ex-wife, C.H. (Mother), for their two minor children. The trial court ordered Father to pay $650 in support per month— about one-third the amount requested by the Department. When calculating the support amount, the court imputed $12,500 in monthly income to Mother, who left a lucrative job to become a caregiver to the children. It also deviated downward from the uniform guideline level because Mother's high-earning new spouse paid all of her family's household-related expenses.

Mother appeals the support order, which she believes is too low. She argues the court erred by imputing income to her because she left her previous job to care for her children, not to evade her familial or financial responsibilities. Further, she claims the court violated Family Code section 4057.5, which generally prohibits a court from considering the income of a parent's new spouse when determining child support.[1]

The trial court did not abuse its discretion by imputing income to Mother. However, it erred by considering the income of Mother's high-earning new spouse to reduce the support ordered below the guideline level. Therefore, we reverse the support order and remand the matter for further proceedings consistent with the opinions expressed herein.

---

[1]    Further undesignated statutory references are to the Family Code unless otherwise noted.

## II

## BACKGROUND

A. *Factual Background*

Father and Mother married in 2003 and separated in 2011. They had two minor children while they were together.

In 2014, Father and Mother divorced. As part of the marital settlement, they agreed no child support payments were necessary at the time and they would share joint physical and legal custody of the children.

At the time of the divorce, Mother worked as a senior software engineer and earned an annual salary of $146,000. Father worked as a mechanical engineering manager and earned about the same annual salary as Mother.

In 2014, after the divorce was final, Mother remarried and stopped working to become a stay-at-home parent. According to Mother, she and her new husband "agreed that it would be better for [her] to focus more on parenting." Job-related factors also contributed to her decision to stop working. In particular, her employer reduced her pay, outsourced some of her work abroad, and required her to come into the office rather than working from home. One year after Mother stopped working, she and her new spouse had a child together.

In 2017, Mother and her family moved from Los Angeles to Coronado for quality-of-life reasons and Father moved to Coronado to remain close to the children. Father maintained his existing employment and worked remotely most of the time.

B. *Procedural Background*

On December 16, 2020, the Department—at Mother's request—filed the present action and asked the trial court to order Father to pay child support to Mother at the guideline level. The Department estimated the

3

guideline level was $1,808 per month. Soon after filing the case, the Department moved for a judgment of guideline support.

In connection with the Department's motion, Mother and Father filed income and expense declarations. On her declaration, Mother reported she had a monthly income of $0 and her new spouse had a monthly income of $77,439. She stated she had $37,462 in cash and $752,000 in real and personal property (measured at fair market value minus debts owed). Father reported he had a monthly income of $19,722. He stated he had $12,000 in cash and $457,526 in stock, bonds, or other easily-sellable assets.

The trial court set the matter for an evidentiary hearing and issued an interim order requiring Father to make temporary guideline level support payments to Mother. At the hearing, the court received into evidence the parents' judgment for dissolution of marriage, their income and expense declarations, and income tax returns and other documents reflecting the income and assets of Mother and her new spouse. It also heard testimony from both parents.

One key topic addressed at the hearing was Mother's ability and opportunity to work. As noted, Mother previously worked as a senior software engineer, earned an annual salary of $146,000, and stopped working to become a caregiver to the children. Based on his experience as a hiring manager and mechanical engineering manager, Father opined Mother would be qualified for a senior software engineer position if she were to seek out work. He testified his employer paid an annual salary of $90,000–$120,000 to new hires with Mother's skill sets and no prior work experience. He estimated Mother would earn $150,000 annually due to her prior work experience. He testified Mother's programming knowledge may be dated due

4

to her time away from the workforce, but it would not disqualify her from finding a job because she could adapt and apply her "fundamentals."

Mother disagreed with Father's characterization of her ability and opportunity to work. She testified her previous salary was variable and, although she earned $146,000 in her final year of work, her salary was as low as $35,000 in other years. She testified the computer programming industry had changed considerably since she stopped working and her programming skills were no longer current. She stated she no longer had any industry contacts and would need to be retrained to return to work. But, in response to questioning from the court, she testified she could perform quality assurance work in the programming field and would enjoy that type of work.

A second topic discussed at the hearing was Mother's high-earning new spouse and his payment of household expenses. Mother's new spouse earned nearly $1 million per year. Mother testified he paid all of her family's expenses, including expenses relating to her children, her credit cards, and the home she and her new spouse owned in Coronado.[2] When asked why she sought support from Father, Mother testified she did not "believe it[] [was] [her] current husband's responsibility to support [her] children. [She] thought it was the father's responsibility to support the[] children."

The last topic of relevance addressed at the hearing was the impact a support order would have on Father's finances. Father testified he previously owned a home in Los Angeles, but lived with his girlfriend in a rental home in Coronado. He testified his housing costs doubled when he moved to Coronado and he expected they would rise further. He stated he saved about $4,000 per month, but spent some of his savings on the children's college

---

[2]     Mother estimated her household had nearly $20,000 in expenses per month.

savings funds, their health savings accounts, and unanticipated expenses like SAT preparation courses and driver's education courses. According to Father, a guideline support order would hinder his ability to maintain his standard of living and his children's standard of living while they were in his care.

At the close of the hearing, the court ruled from the bench. It imputed a gross monthly income to Mother of $12,500 and, based in part on that figure, set the presumptively-correct guideline level at $1,205 per month.

After calculating the guideline level, the court ordered Father to pay about half that amount—$650 per month. It cited three considerations in support of its downward deviation. First, it noted that Mother's new spouse paid all of her family's expenses. Second, it found both parents had substantially equal time-sharing of the children, yet a much higher percentage of Father's income was used for housing than the percentage of Mother's income that was used for housing. (See § 4057, subd. (b)(5)(B).) Third, it noted Father's "basic living expenses," including the "unexpected" expenses to which he testified.

Thereafter, the court issued a written order requiring Father to pay $650 in monthly support to Mother. No party requested a statement of decision. Mother appeals the child support order.

### III
### DISCUSSION

A. *Statutory Framework*

"Child support awards in California are governed by … legislation that established a statewide uniform child support guideline. (See §§ 4050–4076.) 'The court shall adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances' identified in the statute. (§ 4052.) The child support guideline is a mathematical formula set forth in

6

section 4055 and the amount generated by the formula is presumptively correct. (§§ 4053, subd. (k), 4057, subd. (a).)" (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1038 (*Morton*).) The child support guideline is "intended to achieve *uniformity* among like cases." (*In re Marriage of Denise & Kevin C.* (1997) 57 Cal.App.4th 1100, 1105; see also § 4053, subd. (j) ["The guideline seeks to encourage fair and efficient settlements of conflicts between parents and seeks to minimize the need for litigation."].)

"The 'total net monthly disposable income of both parties' is a component of the formula used in the statewide uniform guideline for determining child support. (§ 4055, subd. (b)(1)(E).)" (*Morton, supra*, 27 Cal.App.5th at p. 1038; see § 4052.5.). A parent's net disposable income is calculated by taking the parent's gross income and then deducting amounts attributable to various items enumerated in section 4059. A parent's gross income is defined broadly as "income from whatever source derived," subject to statutory exceptions not relevant to these proceedings. (§ 4058, subd. (a).) "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children, taking into consideration the overall welfare and developmental needs of the children, and the time that parent spends with the children." (*Id.*, subd. (b)(1).)

The guideline level is the presumptively-correct amount of child support, but it may be rebutted. (§ 4057, subds. (a)–(b).) To obtain a deviation from the guideline, a parent must show, by a preponderance of the evidence, that "application of the formula would be unjust or inappropriate in the particular case" due to one or more statutorily-enumerated factors. (*Id.*, subd. (b).) These factors include cases with "special circumstances," such as when "both parents have substantially equal time-sharing of the children and

7

one parent has a much lower or higher percentage of income used for housing than the other parent." (*Id.*, subd. (b)(5)(B).) If the court issues a support award that differs from the guideline level, it must state, in writing or on the record: (1) the guideline amount, (2) the reasons the support ordered differs from the guideline amount, and (3) the reasons the support ordered is consistent with the best interests of the children. (§ 4056, subd. (a).)

We review child support orders for abuse of discretion. (*In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 529.) In conducting this review, we assess "(1) whether the trial court's factual findings are supported by substantial evidence, (2) whether the trial court followed applicable legal principles, and (3) whether the trial court reasonably exercised its discretionary authority— that is, whether any judge reasonably could have made such an order." (*Ibid.*; see *Morton, supra*, 27 Cal.App.5th at pp. 1038–1039.)

B. *The Doctrine of Implied Findings*

Under section 3654, a party to a child support proceeding may request that the court include a statement of decision with its support order. (§ 3654 ["At the request of either party, an order modifying, terminating, or setting aside a support order shall include a statement of decision."]; see *In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1248 (*McHugh*) [statement of decision required in child support modification proceeding].)

"[A] statement of decision is a formal legal document containing the factual and legal basis for the court's decision on each principal controverted issue for which a statement is requested." (*In re Marriage of Buser* (1987) 190 Cal.App.3d 639, 642.) It "gives the trial court 'an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests.' " (*A.G. v. C.S.* (2016) 246 Cal.App.4th 1269, 1282, italics omitted; see *In re Marriage of Brewster &*

8

*Clevenger* (2020) 45 Cal.App.5th 481, 516 [a statement of decision " 'enables a reviewing court "to determine what [law] the trial court employed" ' "].)

If a party fails to request a statement of decision when one is available, we will apply " 'the doctrine of implied findings and presume[] the trial court made all necessary findings supported by substantial evidence.' " (*Alvarez v. Altamed Health Servs. Corp.* (2021) 60 Cal.App.5th 572, 581.) " ' "In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." ' [Citation.] The doctrine of implied findings 'is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error.' " (*Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186, 197 (*Abdelqader*).)

Because the implied findings doctrine is merely a corollary to the presumption of correctness and related principles of review, it applies "only on a silent record. [Citations.] In contrast, 'When the record clearly demonstrates what the trial court did, we will not presume it did something different.' [Citation.] Thus, even in the absence of a statement of decision, we are not compelled to resort to a presumption if the record adequately demonstrates the legal theory the court applied." (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1550 (*Border*); *Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 950 ["the record clearly shows what the trial court did at the … hearing, and we will not presume it did something different"]; *Lafayette Morehouse, Inc v. Chronicle Publishing Co.* (1995) 39 Cal.App.4th 1379, 1384 ["When the record clearly

9

demonstrates what the trial court did, we will not presume it did something different."].)

C. *The Court Did Not Err When It Imputed Income to Mother*

When calculating the presumptively-correct guideline level, the trial court found Mother had an earning capacity of $12,500 per month and imputed that income to her, even though she had no actual earnings. Mother challenges the imputation of income to her. She claims the court "explicitly found that [she] did not have the ability and opportunity" to work, yet it nonetheless imputed income to her based exclusively on the fact that she voluntarily stopped working seven years earlier. According to Mother, the court erred in relying solely on her voluntary divestiture of income without considering her reasons for leaving her job.

When a court determines the guideline level, section 4058 permits the court, in the exercise of its discretion, to consider a parent's earning capacity in lieu of actual income, so long as it would be "consistent with the best interests of the children, taking into consideration the overall welfare and developmental needs of the children, and the time that parent spends with the children." (§ 4058, subd. (b)(1).) " ' "Earning capacity is composed of ... *the ability to work*, including such factors as age, occupation, skills, education, health, background, work experience and qualifications ... and ... *an opportunity to work*. ..." [Citation.]' [Citation.] 'The "opportunity to work" exists when there is substantial evidence of a reasonable "likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income." ' " (*McHugh, supra*, 231 Cal.App.4th at p. 1246, fn. omitted.)

Historically, a court's exercise of its discretion to consider a parent's earning capacity in lieu of income " 'was limited to situations where the parent was found to be deliberately shirking family responsibilities by

10

refusing to seek or accept gainful employment.' " (*McHugh, supra*, 231 Cal.App.4th at p. 1245; see *In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291, 1299 ["For most of California legal history, courts confined [the] power [to impute income] exclusively to situations where supporting parents or spouses had reduced their actual incomes out of a bad motivation to reduce their support payments."]; see, e.g., *In re Marriage of Williams* (1984) 155 Cal.App.3d 57, 62; *Philbin v. Philbin* (1971) 19 Cal.App.3d 115, 121.)

However, courts have since clarified that " ' "[b]ad faith" (deliberate avoidance of family financial responsibilities) is *not* a condition precedent to imputation of income in setting the amount of child support." (*In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 998; *In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1216 (*Padilla*); *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1638 (*Ilas*).) As these courts have recognized, section 4058 itself contains no such limitation. (*Hinman*, at p. 999; accord *Moss v. Superior Ct. (Ortiz)* (1998) 17 Cal.4th 396, 424.) Thus, it is now established that, " '*[a]s long as ability and opportunity to earn exist* … the court has the discretion to consider earning capacity when consistent with the child or children's best interests....' " (*State of Oregon v. Vargas* (1999) 70 Cal.App.4th 1123, 1126.) These principles apply both to caregiver and non-

caregiver parents alike.[3] (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1340 ["[w]e decline to carve out an exception to section 4058 for caregiver parents"]; *Hinman,* at p. 999 ["we decline the request to adopt a per se rule prohibiting the imputation of income to parents who refrain from employment in order to care for preschool-age children in all cases"].)

With this background in mind, we return to Mother's argument. She claims the trial court erred because it supposedly found that she did not have the present ability or opportunity to work, yet it imputed $12,500 in monthly income to her anyways based on her voluntary divestiture of income seven years earlier. The record does not support Mother's argument. The court made no express findings in its support order concerning Mother's ability or opportunity to work. Instead, it simply stated that her monthly gross income was $12,500, and that it was imputing income to her in the best interests of the children. Because Mother waived a statement of decision, we must apply the doctrine of implied findings and presume the court made all necessary findings of ultimate fact favorable to the support order, so long as those findings are supported by substantial evidence. (*Abdelqader, supra,* 76

---

[3]     A parent's bad faith conduct is no longer recognized as a requirement for a court to consider the parent's earning capacity, but it is one factor, among other factors, a court may consider when assessing whether it would be in the children's best interests to rely on the parent's earning capacity in lieu of income. (*McHugh, supra,* 231 Cal.App.4th at p. 1256; *Ilas, supra,* 12 Cal.App.4th at p. 1638; but see *Padilla, supra,* 38 Cal.App.4th at p. 1218 ["A parent's motivation for reducing available income is irrelevant when the ability and opportunity to adequately and reasonably provide for the child are present."].) Mother does not argue that the trial court erred in finding that the use of earning capacity rather than actual income was consistent with the best interests of the children. Therefore, we do not address that issue.

Cal.App.5th at p. 197.)  Here, the findings of ultimate fact include findings that Mother had the ability and opportunity to work.

Substantial evidence supported these implied findings.  Mother testified she had a bachelor's degree and years of work experience in the computer programming industry.  Father testified about the computer programming languages with which Mother was familiar and how she could adapt and apply those languages in new ways.  Father—who hired and managed engineers with software and computer backgrounds—testified his company would pay an annual salary of up to $120,000 to new hires with Mother's skill sets, and an annual salary of $150,000 to someone with her work history.  Further, Mother herself admitted she could perform quality assurance work.  Collectively, this testimony constituted substantial evidence that Mother had both the ability and opportunity to work.

Further, the record does not preclude us from applying the doctrine of implied findings in this instance.  While pronouncing its ruling, the court opined that Mother may not be able to perform "exactly" the same work she once did if she were to return to work "tomorrow."  However, the court never stated that Mother lacked the present ability or opportunity to work.  On the contrary, it stated that Mother "ha[d] the ability" to work because she had a bachelor's degree and could get her programming skills "up to speed pretty quickly."  Further, it noted that, by Mother's own admission, "she could do quality assurance" work.  This record supports—not undermines—the court's implied findings that Mother had the ability and opportunity to work.

Because the trial court impliedly found that Mother had the ability and opportunity to work, and those implied findings were supported by substantial evidence, we discern no error in the court's imputation of income to Mother in the amount of $12,500 per month.  (See § 4058, subd. (b).)

D. *The Court Erred By Considering the Income of Mother's New Spouse*

After the court calculated the presumptively-correct guideline level, it exercised its discretion to order support payments below the guideline level. Mother contends the court erred in making this downward modification because it based its modification, at least in part, on the income of her highly-paid new spouse. She claims the court's consideration of her new spouse's income contravened section 4057.5. We agree.

In relevant part, section 4057.5 states: "The income of the obligee parent's subsequent spouse or nonmarital partner shall not be considered when determining or modifying child support, except in an extraordinary case where excluding that income would lead to extreme and severe hardship to any child subject to the child support award, in which case the court shall also consider whether including that income would lead to extreme and severe hardship to any child supported by the obligee or by the obligee's subsequent spouse or nonmarital partner." (§ 4057.5, subd. (a)(2).) "[A]n extraordinary case may include a parent who voluntarily or intentionally quits work or reduces income, or who intentionally remains unemployed or underemployed and relies on a subsequent spouse's income." (*Id.*, subd. (b).)

Prior to 1993, the laws governing child support payments granted courts greater leeway to consider a new spouse's income when determining the proper support level. Former Civil Code section 4721 set forth the method by which courts should calculate the guideline level. (Former Civ. Code, § 4721, subds. (a)–(b).) Subdivision (e) of that statute permitted courts to deviate from the guideline level if the application of the guideline formula would be unjust or inappropriate, the revised amount was in the children's best interests, and one or more statutorily-enumerated factors applied. (*Id.*, subd. (e).) One such factor justifying a deviation was when "[a] parent's subsequent spouse or nonmarital partner ha[d] income that help[ed] meet

14

that parent's basic living expenses, thus increasing the parent's disposable income available to spend on the children." (*Id.*, subd. (e)(3).)

In 1993, the bill that ultimately codified a predecessor version of section 4057.5 into law was introduced in the state legislature. (Sen. Bill No. 145 (1993–1994 Reg. Sess.) § 2.) According to Senator Charles Calderon, the author of the measure, the bill was necessary because "the obligation to support a child should rest primarily with the biological mother and father." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 145 (1993–1994 Reg. Sess.) as amended July 16, 1993.)

A report from the Assembly Committee on the Judiciary elaborated on the arguments in support of the bill. It noted that one of the proffered reasons for considering a new spouse's income was that "additional income of the new mate helps pay some of the household expenses, and thus may free some additional amount of the obligee's or obligor's income that can be used to increase the amount of support being provided for the child of the oblige/obligation." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 145 (1993–1994 Reg. Sess.) as amended June 28, 1993, pp. 3–4.) But the report criticized this approach. It stated that the routine allocation of "a set portion of new mate income ignores the fact that in many cases, the new mate may bring additional expenses, as well as additional income and so there may be no factual basis in a given case for finding there is some additional amount of obligee/obligor income available for support." (*Id.*, at p. 4.) The report identified numerous additional concerns with courts' routine consideration of new mate income, noting for instance that a "new mate is not a party to the [child support] action and has no ability to come into court and participate in the proceedings that are affecting him or her," which could result in "a taking of the stepparent's property without due process." (*Id.,* at p. 5.)

15

Few cases have interpreted section 4057.5 since it was codified into law in 1993. However, those cases that have interpreted the statute have concluded that it broadly prohibits a court from considering a new spouse's income—either directly *or* indirectly—except when it is an extraordinary case and the exclusion of the new spouse's income would lead to extreme and severe hardship to the child. An instructive case in this regard is *In re Marriage of Wood* (1995) 37 Cal.App.4th 1059 (*Wood*), disapproved on another ground by *In re Marriage of Fellows* (2006) 39 Cal.4th 179.

In *Wood*, an ex-husband requested a reduction in the child support payments he owed to his ex-wife on grounds that she remarried a wealthy man. (*Wood, supra*, 37 Cal.App.4th at p. 1062.) In ruling on the request, the trial court stated it was not considering the income of the ex-wife's new spouse, yet it took the ex-wife's new "lifestyle" into account in order to deviate from the guideline level. (*Id.* at pp. 1065–1066.) As the *Wood* court explained, the trial court's consideration of the ex-wife's lifestyle, or standard of living, was "tantamount to considering new mate income." (*Id.* at p. 1066.) It "was another way of considering [new spouse] income, as it impacted the lifestyle of [the ex-wife] and the three children." (*Id.* at p. 1064; see *id.* at pp. 1067–1068 ["While the trial court here claimed to be looking to the lifestyle or 'standard of living' evidence, we find it abused its discretion by considering [the new spouse's] income."].) Because there had been no finding that the exclusion of the new spouse's income would lead to extreme and severe hardship to the children, the *Wood* court concluded the trial court's indirect consideration of new spouse income violated section 4057.5. (*Id.* at p. 1071; see also *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 337 [citing *Wood* and concluding the trial court violated section 4057.5 by indirectly considering new partner income under the guise of lifestyle evidence]; accord

16

*In re Marriage of Romero* (2002) 99 Cal.App.4th 1436, 1444 [statutory prohibition against consideration of new spouse income when making spousal support decisions precludes a court from considering the indirect effect of new spouse income on the obligee spouse's ability to pay or standard of living].)

The *Wood* case is on-point. In the present case, the trial court expressly found the children would not suffer extreme and severe hardship if the income of Mother's high-earning new spouse was excluded from the support determination.[4] Nonetheless, it deviated from the guideline level based on the fact that Mother's new spouse paid all of her family's expenses. Like the lower court's consideration of "lifestyle" evidence in *Wood*, the trial court's decision was tantamount to a finding that the support payments should be reduced because of new spouse income. Absent a finding that the exclusion of new spouse income would cause extreme and severe hardship for the children, the consideration of new spouse income violated section 4057.5.

On appeal, the Department defends the court's deviation from the guideline level.[5] It cites section 4057, subdivision (b)(5)(B), which permits a court to deviate from the guideline level when "[a]pplication of the formula would be unjust or inappropriate due to special circumstances in the particular case," such as when "both parents have substantially equal time-sharing of the children and one parent has a much lower or higher percentage of income for housing than the other parent." The Department contends the trial court did not violate section 4057.5 because it "simply

---

[4]    The court stated, "I don't think it would rise to the level where it would lead to extreme and severe hardship to the children."

[5]    The Department filed the case against Father and sought a guideline support order, but on appeal argues that the trial court acted within its discretion when it ordered Father to pay less than the guideline level.

17

looked at the amount of *each parent's own income* that was spent on housing each month," as authorized by section 4057, subdivision (b)(5)(B).

The problem with the Department's argument is that the court did not merely rely on disparities in the parents' housing expenses when it deviated from the guideline level. Instead, it stated it was relying on the fact that Mother's new spouse paid *all* of the family's expenses, including both housing and non-housing expenses. At the evidentiary hearing, for instance, it opined as follows: "[W]hen I consider my deviation … there's no doubt that there are more resources in Mom's home. [The new spouse's] income is not fiction. I mean, it's real. It's paying all the expenses. So the Court is considering that as a fact when … looking at the deviation. … [T]he fact that [new spouse] is covering all the expenses … that comes in as to [the] deviation."

Later on in the evidentiary hearing, the trial court discussed the disparities in the parents' housing expenses and cited them as one reason for the downward deviation. But then, immediately afterwards, it clarified that the disparities in the parents' housing expenses were not the sole reason for the downward deviation. It stated it was ordering a reduced level of support "*not only for those [housing expense] reasons but for the other reasons …* that there was testimony about … all the expenses are being paid by new husband. … And so the Court is relying on that." (Italics added.) In other words, the court cited the new spouse's payment of *all* the family's expenses (i.e., new spouse income) as a reason for the downward deviation, separate from any disparities in the parents' housing-related expenses.

Father mounts a different defense of the trial court's downward deviation from the guideline level. He points out that Mother waived a statement of decision and notes that the written support order does not expressly articulate why the court reduced his child support obligations below

18

the guideline level.  According to Father, we should apply the doctrine of implied findings, presume the court made all findings of ultimate fact necessary to uphold the order, and assess only whether there was sufficient evidence to support the downward deviation.

In short, Father asks us to turn a blind eye to the actual reasons the trial court deviated downward, which it articulated quite clearly during the evidentiary hearing.  We decline Father's invitation.  Because the doctrine of implied findings is merely a corollary to the presumption of correctness, we will not presume the trial court acted properly and within its discretion when the appellate record unmistakably demonstrates it based its decision on an impermissible factor.  (See *Border, supra*, 142 Cal.App.4th at p. 1550.)

On remand, the court shall recalculate the proper amount of child support in a manner that does not violate section 4057.5.  We express no opinion regarding the proper amount of child support.  We also express no opinion on whether a deviation from the guideline level would be warranted under section 4057 for reasons other than the income of Mother's new spouse.

## IV

## DISPOSITION

The order is reversed and the matter is remanded.  Each party shall bear its own appellate costs.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

DO, J.